UNITED STATES of America, Plaintiff
and Counterclaim Defendant,

v.

VERTAC CHEMICAL CORP., Defendant,
Counterclaimant, Cross Claimant, and
Third Party Plaintiff; and

Hercules Incorporated, Defendant, Cross
Claim Defendant, Counterclaimant,
Cross Claimant and Third Party Plain-
tiff; and

The Dow Chemical Company, Velsicol
Chemical Corporation, BASF Aktienge-
sellshaft, BASF Corporation, Uniroyal
Chemical, LTEE–Ltd., Standard Chlo-
rine of Delaware, Inc. and Five John
Does, Third Party Defendants.

ARKANSAS DEPARTMENT OF
POLLUTION CONTROL
AND ECOLOGY

v.

VERTAC CHEMICAL CORP., Defendant,
Counterclaimant, Cross Claimant, and
Third Party Plaintiff; and

Hercules Incorporated, Defendant, Cross
Claim Defendant, Cross Claimant;
and Third Party Plaintiff; and

The Dow Chemical Company, Velsicol
Chemical Corporation, BASF Aktienge-
sellshaft, BASF Corporation, Uniroyal
Chemical, LTEE–Ltd., Standard Chlo-
rine of Delaware, Inc. and Five John
Does, Third Party Defendants.

Civil Nos. LR–C–80–109, LR–C–80–110.

United States District Court,
E.D. Arkansas.

May 21, 1997.

Sam Blesi, Department of Justice, Land and Natural Resources Division, Washington, DC, A. Douglas Chavis, III, U.S. Attorney's Office, Eastern District of Arkansas, Little Rock, AR, for the United States.

Charles L. Moulton, Attorney General's Office, Little Rock, AR, for the State of Arkansas.

V. Robert Denham, Jr., Powell, Goldstein, Frazer & Murphy, Atlanta, GA, M.M. Norton, Jr., Charles L. Schlumberger, Wright, Lindsey & Jennings, Little Rock, AR, for Hercules, Inc.

Steven W. Quattlebaum and G. Alan Perkins, Williams & Anderson, Little Rock, AR, Susan H. Shumway, Shumway & Merle, Southport, CT, for Uniroyal Chemical.

Richard F. Ricci, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, Samuel E. Ledbetter, Nichols, Wolff, Ledbetter & Campbell, P.A., Little Rock, AR, for Standard Chlorine of Delaware.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

This case involves a 93–acre tract of land in Jacksonville, Arkansas known as the Ver-

tac Site ("Vertac Site" or "Site").[1] As a result of the herbicide production at the Site, the land, buildings, equipment, groundwater, sewer lines, two sewage treatment plants, and floodplains and adjacent creeks became contaminated with 2,3,7,8–TCDD ("dioxin") and other chlorinated carbon compounds. The Vertac Site and Off–Site Areas [2] are on the National Priority List of Superfund cleanup sites established pursuant to Section 105 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*

*Procedural Background and History*

The Vertac Site was originally developed by the United States government in the mid–1930's as a munitions factory. *United States v. Vertac Chemical Corp.*, 489 F.Supp. 870, 873 (E.D.Ark.1980). Sometime between 1946 and 1948, the Site, including the munitions buildings, was sold to a now defunct corporation known as Reasor–Hill Corporation ("Reasor–Hill"). Reasor–Hill made pesticides, including aldrin, dieldrin, and DDT at the Site.

In 1958, Reasor–Hill began the manufacture of phenoxy herbicides, primarily 2,4,5–trichlorophenoxyacetic acid ("2,4,5–T"), 2,4–dichlorophenoxyacetic acid ("2,4–D") and 2,4,5–trichloropropionic acid ("Silvex" or "2,4,5–TP"). *See Id.* at 873–4. During the Reasor–Hill years, waste water from the production process ran through two cooling ponds on the west side of the plant directly to Rocky Branch Creek. Reasor–Hill had no treatment to process the waste water. The amount of waste generated during that period of time is unknown.

In 1961, Hercules, Inc. ("Hercules") bought the Jacksonville facility from Reasor–Hill, and continued the production of phenoxy herbicides, including 2,4,5–T, 2,4–D, and

2,4,5–TP. Hercules operated the plant until 1971. Shortly after it acquired the plant site from Reasor–Hill, Hercules buried drums of chemical waste left over from the Reasor–Hill operations on the Site.

From 1964 through 1968, Hercules produced and supplied to the United States Department of Defense an herbicide known as Agent Orange, used as a defoliant in Vietnam. *See United States v. Vertac Chemical Corp.*, 46 F.3d 803 (8th Cir.1995). Agent Orange is a 50/50 mix of the n-butyl esters of 2,4–D and 2,4,5–T. During the Agent Orange production process, dioxin is formed as a by-product.

Hercules learned of the presence of dioxin in 1965, and thereafter began testing for the presence of dioxin in its product. In that same year, Hercules began converting its method of production to a "toluene extraction" system. During the process, dioxin and other impurities that were extracted underwent a distillation process producing residue (stillbottoms) in which extremely high levels of dioxin were found. Hercules buried drums of toluene stillbottoms at the Site and disposed of them in the landfill areas.

There were numerous leaks and spills during the time that Hercules operated the plant. According to testimony at trial, the leaks and spills were a common occurrence. During the time it operated the plant, Hercules generated hazardous substances, including dioxin, 2,4–D, 2,4,5–T, and other chlorinated carbon-based chemicals which were disposed of at the Vertac Site and Off–Site areas through leaks, spills, drum burial, and other releases into the environment, including discharges through the Jacksonville sewage treatment plant. The Hercules operation resulted in contamination of soil, groundwater, equipment, tanks, sewer lines,

---

**1.** The history of the Vertac Site and Off–Site areas has been discussed in a number of decisions. *See United States v. Vertac Chemical Corp.*, 489 F.Supp. 870 (E.D.Ark.1980); *United States v. Vertac Chemical Corp.*, 588 F.Supp. 1294 (E.D.Ark.1984); *United States v. Vertac Chemical Corp.*, 671 F.Supp. 595 (E.D.Ark.1987), *vacated*, 855 F.2d 856 (8th Cir.1988); *United States v. Vertac Chemical Corp.*, 756 F.Supp. 1215 (E.D.Ark.1991), *aff'd* 961 F.2d 796 (8th Cir.1992); *O'Dell v. Hercules, Inc.*, 904 F.2d 1194 (8th Cir.1990); *United States v. Vertac*

*Chemical Corp.*, 841 F.Supp. 884 (E.D.Ark.1993), *aff'd* 46 F.3d 803 (8th Cir.1995), *cert. denied*, —— U.S. ——, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995).

**2.** The Off–Site areas include Rocky Branch Creek sediments and floodplains, Bayou Meto sediments and floodplains, the Jacksonville old sewage treatment plant and west wastewater treatment plant, and the sewer collection lines.

the sewage treatment plants, and sediments and flood plains in Rocky Branch Creek and Bayou Meto.

In 1971, Hercules leased the facility to Transvaal, Inc. ("Transvaal") which later became Vertac Chemical Corp. ("Vertac"). Vertac continued to manufacture 2,4–D, 2,4,5–T and 2,4,5–TP along with other chemicals. In 1974, Transvaal began storing the barrels of toluene stillbottoms above ground. Vertac continued this practice. Some of the barrels corroded over time, allowing some of the waste to leak into the ground.

In 1979, the United States Environmental Protection Agency ("EPA") restricted 2,4,5–T and its production discontinued. In 1980, the Arkansas Department of Pollution Control and Ecology ("ADPC & E") and the United States of America on behalf of the Environmental Protection Agency ("EPA") filed separate suits against Vertac and Hercules seeking civil penalties and injunctive relief to abate the continuing discharge of toxic and hazardous wastes into the surrounding area.[3] The Court granted the governments' request for preliminary injunctive relief and ordered Vertac to undertake remedial action to arrest the chemical leakage from the disposal sites. *United States v. Vertac Chemical Corp.*, 489 F.Supp. 870 (E.D.Ark.1980).[4] Because Hercules had not been in possession or control of the plant site at the time of the lawsuit, the Court did not order Hercules to undertake any remedial actions. *Id.* at 888.

The Court subsequently approved implementation of a negotiated remedial plan to deal with containment of wastes and monitoring. *United States v. Vertac Chemical Corp.*, 588 F.Supp. 1294 (E.D.Ark.1984). Vertac ceased all operations at its plant in 1986.

The generation of wastes during the operations of the Plant was inherent or unavoidable but there is no evidence as to the amount of wastes generated from production of 2,4,-D, 2,45–T, 2,4,5–TP and other products during the operations of the Vertac plant from the 1950s until it was shut down by Vertac in 1986. When Vertac abandoned the Site in January of 1987, there were over 28,000 drums of 2,4,5–T and 2,4–D on site and 194 bulk storage tanks containing waste material, including 2,4–D, 2,4,5–T and dioxin. The waste in the drums was corroding the drums. The drums and bulk storage tanks were leaking. There was contamination in the buildings on the Site.

Vertac ceased to perform the remedial actions required by the Consent Decrees approved by the Court. Concerned with Vertac's inaction and its financial solvency in light of the sale of its assets and businesses to Inter–Ag third parties, the EPA and ADPC & E petitioned the Court to enforce the Consent Decree and appoint a Receiver. The Court appointed a Receiver, who was given full authority to handle the business affairs of Vertac.[5]

Over time, additional parties were brought in as parties engaged in the search to find all parties who might be liable for environmental harm at the Vertac Site. Cross-claims, counter-claims, third party complaints, were filed, amended and amended again or supplemented.[6]

A number of parties settled and entered into consent decrees. On October 12, 1993, the Court granted summary judgment

---

**3.** The original complaint filed by the United States was brought pursuant to Section 7003 of the Resource Conservation and Recovery Act (RCRA), certain sections of the Clean Water Act and the Refuse Act.

**4.** The case was originally assigned to the Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas. Judge Woods recused in October, 1989, and the case was assigned to the undersigned.

**5.** The Court's Findings of Facts and Conclusions of Law regarding the petition are reported in *United States v. Vertac Chemical Corp.*, 671 F.Supp. 595 (E.D.Ark.1987). The Eighth Circuit

Court of Appeals vacated the decision because Inter–Ag had not been joined as a party to the action. 855 F.2d 856 (8th Cir.1988) (Table).

**6.** In addition to the original parties in the 1980 complaint, the following are among the parties involved at one time or another, in this action: Phoenix Capital Enterprises, Inc., C.P. Bomar, Jr., J. Randal Tomblin, Inter–Ag Corporation, Velsicol Chemical Corporation, BASF Aktiengesellshaft, BASF Corporation, the United States Department of Defense, Intercapital Industries, Uniroyal Chemical Ltd., Uniroyal Chemical, Ltee–Ltd., and Standard Chlorine of Delaware.

against Hercules and in favor of the United States finding that Hercules is jointly and severally liable to the United States for costs incurred and to be incurred by the United States in the remediation of the Vertac Site, the Off–Site Areas and two municipal landfills used by Hercules to dispose of hazardous substances.[7]

Vertac stipulated that it was an owner operator and is liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2) for response costs at the Site areas, the Jacksonville Crane and Weatherford Residence Sites. It also stipulated that it is a liable person as described in Section 107(a)(3) of CERCLA with regard to the Off–Site areas. Pursuant to the parties' stipulation and consent for the entry of a partial judgment of liability against Vertac, the Court found Vertac liable under Section 107(a) of CERCLA, for response costs, including interest, incurred or to be incurred by the United States at the Vertac Site, the Off–Site areas, the Jacksonville Crane Site, and the Weatherford Site, so long as those costs are not inconsistent with the NCP.[8]

The case went to trial on the remaining claims. The claims of the United States, Hercules and ADPC & E against Uniroyal and Uniroyal's claim in contribution were tried in the first phase of the trial commencing on November 3, 1993, before the Court and an advisory jury.[9] The only issue to be resolved in this proceeding was whether Uniroyal's arrangement for Vertac to manufacture a product for Uniroyal out of material supplied by Uniroyal constituted an arrangement for disposal of hazardous substances within the meaning of CERCLA, Section 107(a)(3).

The jury returned a verdict finding Uniroyal liable to the United States, the ADPC & E, and Hercules under Section 107(a)(3) for the Vertac Site and Off–Site Areas. It did not find Uniroyal liable to Hercules for contribution under Section 113 but did find Hercules liable to Uniroyal for contribution under Section 113. The jury also found "divisibility" under the jury instruction proffered by Hercules.

Hercules also brought an action against Standard Chlorine of Delaware, Incorporated ("SCD") seeking response costs and contribution pursuant to Sections 107 and 113 of CERCLA. The jury found SCD was not liable as an arranger.

*Private Party Actions Under Section 107(a)*

Before proceeding to the liability of Uniroyal and SCD, two preliminary matters must be addressed. Both Uniroyal and SCD ask that the Court dismiss Hercules' cost recovery claim under Section 107(a) against them. They argue that Hercules can only bring a contribution claim under Section 113(f) against them.

The basic difference between a Section 107(a) cost recovery cause of action as opposed to a contribution action under Section 113(f) is that in the former, Hercules as a Potentially Responsible Party ("PRP") or Responsible Party ("RP") seeks to hold defendants "jointly and severally" liable for total response costs, whereas in the latter the defendant can only be held liable for its portion of the total response costs, calculated according to "such equitable factors as the court determines are appropriate." *See* 42 U.S.C. § 9613(f) ("In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.") The courts were initially divided as to whether a RP or PRP could sue another under Section 107. See *Stearns & Foster Bedding Co. v. Franklin Holding Corp.,* 947 F.Supp. 790, 798–801 (D.N.J.1996) (discussing cases). However, every court of appeals that has examined the issue has concluded that an action brought by a PRP is a section 113 action for contribution. *See New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1119–20 (3rd Cir.1997).

---

7. The Court found that the United States was not liable under CERCLA for its role in Agent Orange production. *See* 841 F.Supp. 884.

8. See partial stipulation and consent for the entry of partial judgment of liability against defendant Vertac Chemical Corporation, document no. 1964.

9. Prior to the submission of the case to the jury, ADPC & E dismissed its state law claims against Uniroyal.

■ The Eighth Circuit Court of Appeals has not addressed the issue, although one court in this district has.[10] Judge Eisele, in a well-reasoned decision, found that claims between PRPs and RPs are contribution claims governed by Section 113. *Reynolds Metals Co. v. Arkansas Power & Light Co.,* 920 F.Supp. 991, 996 (E.D.Ark.1996). The Court agrees, and need not add to the verbiage on the subject. The claims brought by Hercules against SCD and Uniroyal are contribution claims governed by Section 113, and therefore the Court will dismiss Hercules' Section 107 claims against them.

*Effect of Jury Verdicts*

Also to be determined is the effect of the jury verdicts. The Court empaneled a twelve-person jury who rendered the verdicts discussed above.[11] Because the Court has determined that the private parties are limited to contribution claims under Section 113(f), the only claims to be brought under Section 107 are those of the United States and ADPC & E.

It is well established that because a CERCLA cost recovery action constitutes an action for restitution, which lies in equity, no

---

**10.** In *Wolf, Inc. v. L. & W. Service Center, Inc.,* 1997 WL 141685 (D.Neb. Mar.27, 1997), the court further discusses the state of the law, including a divergence within the district courts in the Eighth Circuit. Based on the facts of the case, the court found that the plaintiffs, as landowners who had not contributed to the hazardous condition of the site, could pursue an action under Section 107.

**11.** The Verdict form for the Uniroyal segment reads, in relevant part, as follows:

(1) Do you find that Uniroyal is liable to the United States and the State of Arkansas as an arranger for the disposal of hazardous substances at the Vertac Site?

X̲ Yes

(2) Do you find that Uniroyal is liable to the United States and the State of Arkansas as an arranger for the disposal of hazardous substances in the off-site areas?

X̲ Yes

(3) Do you find that Uniroyal is liable to Hercules as an arranger for the disposal of hazardous substances at the Vertac Site?

X̲ Yes

(4) Do you find that Uniroyal is liable to Hercules as an arranger for the disposal of hazardous substances in the off-site areas?

right to jury trial attaches to it. *United States v. Northeastern Pharmaceutical & Chem. Co., Inc.,* 810 F.2d 726, 749 (8th Cir. 1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. Mexico Feed and Seed Co. Inc.,* 729 F.Supp. 1250, 1254 (E.D.Mo.1990); *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 205 (W.D.Mo.1985). *See also Hatco Corp. v. W.R. Grace & Co.-Conn.,* 59 F.3d 400, 412 (3rd Cir.1995). The parties agree that the jury verdict as to Uniroyal's liability under Section 107 is advisory.[12]

■ The Seventh Amendment entitles parties to a jury trial in suits at common law. U.S. Const. Amend. VII. " 'Suits at common law' refers to 'suits in which *legal* rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone [are] recognized, and equitable remedies [are] administered.' " *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 564, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990) (quoting *Parsons v. Bedford,* 3 Pet. 433, 437, 7 L.Ed. 732 (1830)).

X̲ Yes

(5) Do you find that Uniroyal is liable to Hercules on Hercules' claim for contribution?

X̲ No

.   .   .   .   .

(6) Do you find that Hercules is liable to Uniroyal on Uniroyal's claim for contribution?

X̲ Yes

.   .   .   .   .

(7) Do you find that Uniroyal has established that its harm to the environment is reasonably distinguishable from the harm for which others are also liable?

X̲ Yes

The Verdict form for the Standard Chlorine segment reads, in relevant part, as follows:

1. We, the jury, find that Standard Chlorine is liable to Hercules for the arrangement for treatment or disposal of hazardous substances at the:
(A) Vertac plant site:
    X̲ No
(B) Offsite Areas:
    X̲ No

**12.** In *Gopher Oil Co., Inc. v. Union Oil Co.,* 955 F.2d 519 (8th Cir.1992), the trial court used an advisory jury for the claims brought under CERCLA and the state counterpart.

The district courts are split as to whether a right to jury trial exists in Section 113(f) contribution claims. *Compare American Cyanamid Co. v. King Industries, Inc.,* 814 F.Supp. 209, 213–215 (D.R.I.1993) (no right to jury trial in contribution action) with *United States v. Shaner,* 1992 WL 154618, at *2–4 (E.D.Pa. June 15, 1992) (right to jury trial in Section 113 action)

Only one appellate court has addressed the issue. In *Hatco Corp. v. W.R. Grace & Co.— Conn.,* 59 F.3d 400 (3rd Cir.1995), the court, after reviewing the treatment of the common-law remedy of contribution in the 18th Century, the legislative history of CERCLA as well as the statutory language, found that "an action for contribution under section 9613(f)(1) is essentially equitable," and that there was no right to jury trial under § 9607 or § 9613. *Id.* at 414.

■ This does not end the inquiry as the parties argue that the jury verdicts on the contribution claims are binding because the private parties consented to a jury trial on those claims. Federal Rule of Civil Procedure 39(c) governs requests for jury trials in cases where the parties are not entitled to a jury trial as of right. *See Alexander v. Gerhardt Enterprises, Inc.,* 40 F.3d 187, 192 (7th Cir.1994). Here, Hercules and Uniroyal requested a jury trial on the contribution claims, and SCD did not object to the request. The Court granted the request.[13]

■ The Court finds that the private parties have consented to a binding jury verdict on the contribution claims. See *Thompson v. Parkes,* 963 F.2d 885 (6th Cir.1992) (finding parties had consented to jury trial on equitable claim); *Bereda v. Pickering Creek Industrial Park, Inc.,* 865 F.2d 49 (3rd Cir. 1989)(same). Therefore, unless the evidence does not warrant sustaining the jury verdict on the claims (see discussion *infra*) the

Court will enter judgment on the jury verdicts.

■ Uniroyal also argues that the jury verdict as to divisibility is binding. It asserts that the verdict is, for all practical purposes, one between Hercules and Uniroyal, each of whom requested a jury trial resulting in a trial by consent. Uniroyal is incorrect in its analysis. Divisibility of harm is a defense to joint and several liability, which is imposed with a finding of liability under Section 107(a) (see discussion *infra*). As there is no right to jury trial on the Section 107(a) claim, the jury finding with respect to divisibility of harm is not binding.

*Arranger Liability of Uniroyal*

In 1978 and 1979, Vertac and Uniroyal entered into tolling agreements for the production of 1.3. million pounds of 2,4,5–T from 1,2,4,5–tetrachlorobenzene ("TCB"). The arrangement between Uniroyal and Vertac was for Uniroyal to send TCB to Vertac for Vertac to use to convert into 2,4,5–T and ship back to Uniroyal.

Under these agreements, Uniroyal imported the TCB to be converted by Vertac into 2,4,5–T and Uniroyal used its own agent to purchase the material in Europe. Uniroyal paid the freight to and from the Vertac facility and paid Vertac a tolling fee to process the material. Uniroyal required Vertac to meet certain product specifications for the final 2,4,5–T produced for Uniroyal. The TCB supplied by Uniroyal was the key ingredient in the process and is known as a specialty chemical.

Uniroyal imported the TCB into the United States under a Temporary Import Bond ("TIB") to avoid the payment of duties or taxes. Each shipment of TCB had a different TIB number assigned to it, and Uniroyal paid no customs duties on any of those shipments. Instead, Uniroyal simply posted a

13. In its Order of October 7, 1993, the Court stated as follows:

A number of parties have requested a jury trial. Other parties have objected, arguing that the parties are not entitled to a jury trial on the issues pending. The Court has reviewed the submissions and will grant the request for a jury trial. A twelve-person jury will be empaneled, and will decide those issues which are

properly to be decided by the jury and will act as an advisory jury with respect to the other issues. F.R. Civ.P 39(c).

In a footnote, the Court stated that it did not need to decide, at that time, which issues should be resolved by the jury. After the trial, the Court asked the parties to address the effect of the jury verdicts.

bond in order to assure the United States Customs Office that the materials being imported would be processed and then exported within a specified period of time.

Under this bond posted by Uniroyal, Uniroyal represented to the United States Custom Service that it would have the TCB processed into 2,4,5–T by Vertac, shipped to Canada within one year, and that it was not being imported for sale or any other purpose. According to the requirements of the TIB, the entity bringing the material, that is the TCB, into the United States (in this case Uniroyal) maintains ownership of the material throughout the transaction. Therefore, at all times, the TCB supplied to Vertac by Uniroyal for Vertac's production of the 2,4,5–T for Uniroyal was owned by Uniroyal.

Vertac did not purchase the TCB from Uniroyal and Vertac's records reveal that it did not charge Uniroyal for the TCB. Vertac charged Uniroyal a tolling fee to process the TCB into 2,4,5–T, which included payment for Vertac's cost to process the TCB and the cost for additional raw materials that Vertac added to the process. The agreements also provided for waste and spillage of the TCB during processing into 2,4,5–T by requiring Uniroyal to supply 1.01 pounds of TCB for each pound of 2,4,5–T.

Vertac accounted for the TCB material as Uniroyal's material throughout the manufacturing process. Vertac kept separate records tracking the receipt of Uniroyal's TCB, as well as separate records of its production runs of 2,4,5–T for Uniroyal. As further evidence that the TCB supplied to Vertac was Uniroyal's TCB, Uniroyal instructed Vertac to provide insurance for Uniroyal's TCB from the time the TCB arrived at the Vertac Site until the 2,4,5–T from Uniroyal's TCB was shipped back to Uniroyal.

When Uniroyal became concerned with the financial condition of Vertac, Uniroyal arranged to rent a warehouse at the Site for separate storage of its material to facilitate the segregation and to protect its material from possible seizure from creditors. As a further means of protection, Uniroyal arranged to ship only small amounts of its material to Vertac to limit its losses in the event of seizure.

As further evidence of Uniroyal's ownership of the TCB throughout the process, it took the position during a dispute with U.S. Customs concerning whether Uniroyal and Vertac had violated the terms of the T.I.B., that practically all the 2,4,5–T received from Vertac was produced principally from Uniroyal's TCB, and that all the T.I.B. TCB would have been used to make Uniroyal's 2,4,5–T. Uniroyal relied upon Vertac's accounting records which formed the basis of Uniroyal's position, and which led to the conclusion by U.S. Customs that the greater part of the 2,4,5–T acid manufactured from Uniroyal's TCB was in fact exported back to Uniroyal.

When TCB is processed into 2,4,5–T, dioxin is generated. Uniroyal knew that the processing of TCB for production of 2,4,5–T generated dioxin. Furthermore, at the time the dioxin was generated during the production of Uniroyal's TCB into Uniroyal's 2,4,5–T, Uniroyal owned the material. Vertac removed the dioxin inherent in the production by washing trichlorophenol ("TCP"), a precursor chemical in the production of 2,4,5–T with toluene and distilling the toluene into waste "stillbottoms" which contained the dioxin. Thus, in addition to dioxin, TCB, TCP, and 2,4,5–T were generated, disposed of, and released during the processing of Uniroyal's materials.

The stillbottom wastes were stored in 55–gallon drums and placed in the north field above the plant site. Over the years, the contents of the drums leaked into the surrounding soil and were carried by the rain into the cooling pond and Off–Site Areas, including Rocky Branch Creek. The drums deteriorated and had to be placed in larger drums and moved to a more secure area for storage.

During the remaining stages of the processing of Uniroyal's material into 2,4,5–T, leaks and spills occurred throughout the system on a daily basis. The TCP holding tanks, which would have contained Uniroyal's material, also leaked. In addition to contaminating the Vertac Site, the leaks and spills also contributed to contamination of the Off–Site Areas.

The exact amount of wastes generated and disposed of as a result of the Uniroyal–Vertac agreements is not known. Vertac stored over 3,000 drums of 2,4,5–T waste in the north field, some of which contained Uniroyal's waste.

The Remedial Investigation/Feasibility Study ("RI/FS") reports conducted for the Vertac Site indicate the presence of dioxin, 2,4,5–T, 2,4,5–TP, TCB, TCP, 2,4–D, among other hazardous substances in the surface soils, below surface soils, the sewer lines beneath the plant site, the buildings, equipment, tanks, pipes, vessels and the groundwater. The RI/FS reports also indicate that the groundwater contains a number of contaminants such as 2,4,5–T, 2,4–D, dioxin, toluene, and methanol. The RI/FS for the Off–Site Areas indicates the presence of dioxin in significant quantities in the Rocky Branch flood plains, the sewer lines, and the sewage treatment plants. These contaminants result from the years of operation of the Vertac plant.

When Vertac abandoned the Site in January of 1987, there were over 28,000 drums of 2,4,5–T and 2,4–D stillbottom wastes at the Vertac Site and 194 bulk storage tanks. Some of these drums and tanks contained dioxin contaminated waste from the production of Uniroyal's 2,4,5–T. Testing of the drums reveals that there has been almost total commingling and cross-contamination of waste materials in the drums.

Although Vertac discontinued the production of 2,4,5–T in 1979, it continued to use the equipment until December, 1986, for the production of materials which did not generate dioxin. The equipment is contaminated with dioxin. The dioxin, TCB, TCP, and 2,4,5–T generated by Hercules and Vertac, including that generated for Uniroyal, are chemically indistinguishable and commingled in the soil, sediments, flood plains, sewer lines, drums, and equipment. All are hazardous substances within the meaning of CERCLA.

At the time of trial, about 15,000 drums of wastes, as well as contaminated equipment, soil and sediments remained at the Site. The 2,4,5–T drums are among those remaining. The evidence, therefore, shows that there have been releases of hazardous substances at the Vertac Site and that there is a continuing threat of release of hazardous substances at the Site. The United States, ADPC & E and Hercules have incurred response costs in treating the releases and threats of release.

**Liability Under Section 107(a)(3)**

■ In order to prove liability, the plaintiffs must show that Uniroyal is an arranger; that a release or threatened release from a facility has occurred; that the plaintiffs have incurred response costs as a result; and that the costs were necessary and consistent with the national contingency plan. *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 934 (8th Cir.1995).

There is no dispute that the Vertac Site is a facility within the meaning of CERCLA. The dioxin, TCP, TCB, and 2,4,5–T generated during the production process are hazardous substances within the meaning of CERCLA. The evidence further shows that there have been releases of hazardous substances at the Vertac Site and that there is a continuing threat of release of hazardous substances at the Site. The plaintiffs have incurred response costs in treating the releases and threats of release.

■ Uniroyal asserts that the jury was not instructed correctly, and therefore its finding of liability is erroneous. It argues that continuous and exclusive ownership of the raw materials, the work in process, and the finished product are required for arranger liability, and that plaintiffs have not met their burden of proving these elements.[14] Because the jury verdict is advisory as to

14. With respect to Uniroyal's liability as an arranger, the jury was instructed:

   When two companies enter into an arrangement whereby one company which owns the raw materials furnishes those raw materials to another company to be further processed into a product to be returned to the company furnishing the raw materials, and the generation of waste is inherent in that further process, that arrangement is an arrangement for disposal by the furnishing party under CERCLA. If you find from the evidence that the arrangement between Uniroyal and Vertac is an arrangement such as I have just described, you should find that the arrangement was an arrangement for disposal by Uniroyal.

arranger liability under Section 107, the Court must make its own findings of fact and conclusions of law based on the evidence.[15]

The phrase "arranged for" is not defined in the statute.[16] "Congress has left this task to the courts, and the courts have at times struggled with the contours of 'arranger' liability under § 107(a)(3)." *South Florida Water Management Dist. v. Montalvo*, 84 F.3d 402, 406 (11th Cir.1996).

The Eighth Circuit has given a liberal interpretation to "arranger" liability, given CERCLA's "'overwhelmingly remedial scheme.'" *United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1381 (8th Cir.1989) (citations omitted).[17]

*Aceto* remains the leading authority in this Circuit on arranger liability. In that case, pesticide manufacturers hired a formulating company to mix and package pesticides for them. The complaint alleged that the manufacturers owned the technical grade pesticide alleged to be a "hazardous substance" under CERCLA, the work in process and the resulting product. "[T]hat is, the defendant retained ownership of its pesticide throughout the formulation and packaging process." *Id.* at 1378. The complaint further alleged that the generation of wastes was inherent in the formulation process and that wastes were in fact generated and disposed of at the site. The court found that the complaint alleged

sufficient facts to hold that the pesticide manufacturers had arranged for the disposal of hazardous wastes. Evidence of actual control was not necessary for arranger liability if ownership issues were otherwise established. *Id.* at 1375–1382. Furthermore, proof of specific intent to arrange for the disposal of hazardous substances is not required. *United States v. TIC Investment Corp.*, 68 F.3d 1082, 1088 (8th Cir.1995), *cert. denied*, — U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996).

■ The Court concludes that the evidence establishes that Uniroyal owned the TCB it supplied to Vertac for processing into 2,4,5–T, that Uniroyal retained an ownership interest in its material during the processing stage, that Uniroyal owned the 2,4,5–T that was returned, that the generation of hazardous substances was inherent during the processing of Uniroyal's material, and that the processing by Vertac resulted in the release of hazardous substances. Thus Uniroyal is liable as an arranger under CERCLA. 42 U.S.C. § 9607(a)(3).

### Liability Under Section 113

As noted above, the jury found that Uniroyal was not liable to Hercules for contribution under Section 113(f), while Hercules was liable to Uniroyal for contribution.[18] Hercu-

---

15. Because the jury verdict was advisory with respect to liability under Section 107(a)(3), the correctness of the jury instruction given is not relevant. Thus, even assuming Uniroyal advances a meritorious argument that the jury instruction is incorrect in that it did not include all the elements of arranger liability as set forth in *Aceto*, the Court in its own analysis finds Uniroyal liable as an arranger. *See* factual findings, *supra* and conclusions, *infra*.

16. Section 107(a)(3) of CERCLA defines an arranger as:

any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance ...

42 U.S.C. § 9607(a)(3).

17. The court in *Mathews v. Dow Chemical* Co., 947 F.Supp. 1517 (D.Colo.1996) discussed interpretation of arranger liability by the Eighth, Eleventh and Seventh Circuits. The court noted that the Eighth Circuit in *Aceto* "provides the most liberal interpretation of 'arranged for.'" *Id.* at 1523. *See also South Florida Water Management Dist. v. Montalvo*, 84 F.3d 402, 407, 408 n. 9 (11th Cir.1996) (case-by-case analysis, focusing on factors such as party's knowledge of disposal, ownership of the hazardous substances, and intent; refuses "wholesale adoption of *Aceto*" as law of the circuit).

18. On the issue of Uniroyal's contribution to Hercules the jury was instructed:

Previously in this case, this Court determined as a matter of law that Hercules is a party liable for clean-up costs at the Jacksonville site and offsite areas. Under CERCLA, any liable party or any party which has paid response costs may seek contribution from any other

les asks that the Court enter judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.

In ruling on a motion for judgment as a matter of law after trial, the Court must view the evidence in the light most favorable to the prevailing party and must not engage in weighing or evaluating the evidence or considering questions of credibility. Judgment as a matter of law "is appropriate only when all the evidence points one way and is 'susceptible of no reasonable inference sustaining the position of the nonmoving party.'" *Commercial Property Investments. Inc. v. Quality Inns Int.'l. Inc.*, 61 F.3d 639, 644 (8th Cir.1995) (citation omitted).

Uniroyal argues that the jury finding can stand, as contribution requires a finding of causation of contamination. *Farmland Industries. Inc. v. Morrison–Quirk Grain Corp.*, 987 F.2d 1335, 1342 n. 6 (8th Cir.1993). *See also Control Data*, 53 F.3d at 935 (focus during contribution on harm each party causes the environment; liable party responsible for its share of all response costs not just those "caused" by its release); *Elf Atochem North America, Inc. v. United States*, 833 F.Supp. 488, 494 (E.D.Pa.1993) (Eighth Circuit in *Farmland* found that proper focus is causation of contaminants at site, not the causation of response costs).

As found above, Uniroyal is liable as an arranger under Section 107(a)(3) of CERCLA. The jury verdict as to contribution would only have merit if Uniroyal's hazardous substances caused a release or threat of release without causing contamination. The evidence, however, is conclusive that during the processing of the TCB on behalf of Uniroyal to make the 2,4,5–T, hazardous substances, including dioxin, were generated, and that these were disposed of at the Site and Off–Site Areas. Furthermore, Uniroyal's hazardous substances did, indeed, cause contamination at the Site. The Court must, therefore, find that there is insufficient evidence to sustain the jury's verdict regarding Uniroyal's liability for contribution and that Hercules is entitled to judgment as a matter of law on its claim for contribution against Uniroyal. Thus, Uniroyal is liable for its share, as determined by Section 113(f), of all response costs. *Control Data*, 53 F.3d at 936.

While asserting that the jury verdict finding Uniroyal not liable for contribution cannot be sustained, Hercules then argues that there is no evidence to support the jury's verdict finding it liable for contribution.[19] The argument, of course, is without merit. The Court has already found Hercules jointly

---

party who is liable or potentially liable under CERCLA. Hercules has brought such a contribution claim against Uniroyal in this case.

To establish a valid claim for contribution under CERCLA § 113, you must first find that Uniroyal is liable to the United states government or the state of Arkansas as an arranger for the disposal of hazardous substances as you were instructed earlier. In addition to the elements of arranger liability, Hercules must also establish the following elements by a preponderance of the evidence:

(1) that Uniroyal's actions caused contamination at the Jacksonville site and offsite areas; and

(2) that Hercules incurred response costs as a result of the contamination caused by Uniroyal.

If Hercules fails to prove either of the above elements by a preponderance of the evidence, then you must find that Uniroyal is not liable to Hercules under this claim.

19. The jury instruction concerning Uniroyal's Section 113 claim against Hercules reads as follows:

Previously in this case, this Court determined as a matter of law that Hercules was jointly and severally liable for clean-up costs at the Jacksonville site and offsite areas.

Under CERCLA, any liable party or any party which has paid response costs may seek contribution from any other party who is liable or potentially liable under CERCLA. If you first find Uniroyal liable under CERCLA, Uniroyal then makes such a contribution claim against Hercules in this case, for response costs Uniroyal will be required to pay in the future. Because this Court has already determined as a matter of law that Hercules is jointly and severally liable for response costs at the Jacksonville site and off-site areas, Uniroyal must establish only one additional element to prove a valid claim for contribution under CERCLA § 113. Uniroyal must establish the following element by a preponderance of the evidence:

that Hercules' actions caused contamination at the Jacksonville site and offsite areas.

If Uniroyal fails to prove this element by a preponderance of the evidence, then you must find that Hercules is not liable to Uniroyal under this claim.

and severally liable under Section 107.[20] There is no doubt that Hercules caused contamination at the Site during its years of operation there. Thus, judgment will be entered in favor of Uniroyal on its Section 113 claim against Hercules.

*Divisibility of Harm*

As stated above, divisibility of harm is a defense to joint and several liability. Thus, a defendant will not be held jointly and severally liable to a governmental or non-liable private plaintiff "where the defendant can demonstrate that the harm at a given site is 'divisible,' i.e., there are distinct harms or a reasonable basis for determining the contribution of each cause to a single harm." *Redwing Carriers, Inc. v. Saraland Apts.,* 94 F.3d 1489, 1513 (11th Cir.1996).

In response to a special interrogatory the jury found that Uniroyal had established "that its harm to the environment is reasonable distinguishable from the harm for which others are also liable." [21] As discussed above, the jury finding on this issue is advisory and therefore the Court is not bound by the jury's determination.

The burden is on Uniroyal to demonstrate that there is a reasonable basis for determining the contribution of each cause to a single harm. *United States v. Colorado & Eastern R. Co.,* 50 F.3d 1530, 1535 (10th Cir.1995). The burden on Uniroyal is substantial and the analysis is "factually complex." *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 269 (3rd Cir.1992) ("Alcan–Butler") *See Control Data,* 53 F.3d at 934 n. 4 ("Once liability is proved, all of the defendants are jointly and severally liable, unless *a particular defendant can establish that his harm is divisible, very difficult proposition."*) (emphasis added).

Uniroyal relies on production capacity at the Site during its years of operation or the number of barrels of waste existing at the Site prior to incineration as bases for determining divisibility. While Uniroyal attempted to provide evidence that the hazardous substances generated from Vertac's production of 2,4,5–T for Uniroyal were only a small amount of the total hazardous substances disposed of at the Site and Off–Site areas, those hazardous substances are indistinguishable, and commingled with, other hazardous substances at the Site.[22] Indeed, Uniroyal argued in its defense that its raw material and finished product were commingled with other raw material and finished product at

---

**20.** Indeed, Hercules argues in its proposed conclusions that a finding of liability under Section 107(a) is the only prerequisite to liability for contribution under CERCLA Section 113(f), and therefore Uniroyal is liable to Hercules. Hercules' argument with respect to Uniroyal contradicts its assertion that the jury's verdict finding Hercules liable for contribution cannot be sustained.

**21.** With respect to divisibility of harm, the jury was instructed:

If following these instructions, you find that Uniroyal arranged for disposal of hazardous substances at Vertac, even though others also contributed to the release of hazardous substances, you must find that Uniroyal is liable to the Untied States and the State of Arkansas for the entire amount of the United States' and the State of Arkansas' costs. This liability is what the law calls joint and several liability. It means that a plaintiff can recover the entire damages from any individual defendant, though it cannot, of course, recover that amount more than once.

This joint and several liability applies even if the defendants acted at different times, or even when other parties, not now before the Court, contributed also.

The law also recognizes a defense to joint and several liability—divisibility of harm. When two or more parties are liable under CERCLA for harm to the environment, and one of those parties claims that it should be liable only for the harm to the environment that is attributable to it, then the burden of showing how the harm of that one party can be distinguished from the harm of the others is upon the party seeking to so limit its liability.

Accordingly, if you find that Uniroyal is liable under the other instructions given to you, then Uniroyal will have the burden of proving to you that the harm to the environment for which it is liable is reasonably distinguishable from the harm for which others are also liable. If Uniroyal does not prove this distinction to your satisfaction, then Uniroyal would be jointly and severally liable with others who might also be liable for the environmental harm at the sites in issue in this action.

**22.** The volume or quantity of wastes produced during production of Uniroyal's 2,4,5–T may be relevant in allocating response costs under Section 113(f). *See Redwing Carriers,* 94 F.3d at 1514 n. 32.

the Vertac Site, so that it could not have retained any ownership interest. However, if these products were commingled, by Uniroyal's own admissions, then it would follow that some of the hazardous substances generated from the production of that material were also commingled.

■ Uniroyal's reliance on volumetric evidence is insufficient in this instance to meet its burden. Where, as in this case, hazardous substances are commingled, a defendant cannot rely on merely volumetric evidence. Evidence must be produced "disclosing the individual and interactive qualities of the substances deposited" at the Site. *United States v. Monsanto Co.*, 858 F.2d 160, 172 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). This includes proof of the "relative toxicity, migratory potential and synergistic capacity" of the various substances present. *Id.* at 172 n. 26. *See also Alcan–Butler*, 964 F.2d at 269 (analysis of divisibility of harm factually complex "as it will require an assessment of the relative toxicity, migratory potential and synergistic capacity of the hazardous waste at issue.") *But see Matter of Bell Petroleum Services. Inc.*, 3 F.3d 889, 903–904 (5th Cir. 1993) (defendant met burden of proving reasonable basis for apportioning liability on volumetric basis where only one hazardous substance, and no synergistic effects),

■ Uniroyal did not call any expert witnesses to discuss the relative toxicity, migratory potential or synergistic effects of the commingled hazardous substances at the Site. It disregards hazardous substances, beside dioxin, that were produced during the manufacture of Uniroyal's 2,4,5–T. Uniroyal's reliance on the number of drums as a basis for divisibility ignores evidence of leakage, cross-contamination and commingling. There is no evidence "showing a relationship between waste volume, the release of hazardous substances and the harm at the site." *Monsanto*, 858 F.2d at 172.

In sum, Uniroyal has failed to present sufficient evidence to allow the Court to apportion the harm. Finding that Uniroyal has failed to prove divisibility of harm, the Court

finds that Uniroyal's liability is joint and several.

*Hercules' Claims against SCD*

The second segment of the liability trial involved the third party claim by Hercules against SCD.[23] Hercules' claim arises from SCD's sale of mixed TCBs, also known as trichlorobenzene still bottoms or polychlors, to Transvaal, Inc., Vertac's predecessor in interest (hereinafter referred to as "Vertac"). Hercules contends that SCD's sale of these polychlors to Vertac constituted an arrangement for disposal or treatment of a hazardous substance and SCD is a liable party under § 107(a)(3) of CERCLA, which imposes arranger liability. Hercules seeks contribution under Section 113 for SCD's share of Hercules' liability to the United States under previous orders of the Court.

A detailed analysis of the transaction is necessary to determine whether it was in fact a sale or an arrangement for disposal of a hazardous substance. *See United States v. Petersen Sand and Gravel, Inc.*, 806 F.Supp. 1346, 1354 (N.D.Ill.1992) (No bright line between a sale and a disposal under CERCLA; party's responsibility under Section 107(a)(3) must turn on fact-specific inquiry into nature of transaction). Because of the nature of the transaction, some discussion of the chemical reactions involved is necessary.

From around November 1971 through April 1979, Vertac manufactured 2,4,5–T at the Jacksonville plant. 1,2,4,5–tetrachlorobenzene ("1,2,4,5–TCB") was an essential raw material for Vertac's manufacture of 2,4,5–T. Until the end of 1973, Vertac purchased 1,2,4,5–TCB primarily from Hooker Chemical.

In 1973, Vertac learned that Hooker planned to discontinue sales of 1,2,4,5–TCB at the end of the year. Vertac then began looking for alternate supplies of 1,2,4,5–TCB so that it could continue manufacturing 2,4,5–T.

SCD is a manufacturer of a range of chemical intermediates known as chlorinated benzenes, made by reacting chlorine gas and benzene together. During this reaction, iso-

---

**23.** As discussed above, Hercules' Section 107 claim against SCD is dismissed.

mers and chlorinated benzene compounds are created, including monochlorobenzene ("MCB"), dichlorobenzene, trichlorobenzene ("tri"), and tetrachlorobenzene ("TCB"). In the production of chlorobenzenes, it is impossible to produce a particular chlorinated benzene compound or isomer to the exclusion of others.

During the production process, chlorine and benzene were reacted together, and the chlorinated mass was then moved to a series of distillation columns. In the first distillation column, the first product separated out was MCB, and it was placed into a storage tank pending shipment to SCD's customers.

The remaining material, consisting of paradichlorobenzene ("PDCB"), orthodichlorobenzene ("ODCB"), and Tris moved from the bottom of the MCB distillation column into a series of two columns. PDCB was removed from the top of the first of the two columns. It was placed into a different storage tank pending shipment to SCD's customers. ODCB was distilled off the top of the second column, and placed in a third storage tank.

The remaining materials were a mixture of Tris referred to as "crude trichlorobenzene." These materials were shipped to SCD's plant in New Jersey for further processing.

In what SCD asserts is "product balance," SCD states that it was essential to its economic success to sell each of the chlorinated benzene compounds or isomers that was produced during the chemical reactions. It therefore began to search for new markets for each of its products, looking particularly to major chemical companies.

In 1972, Dupont approached SCD to supply a large requirement of ODCB for Dupont's use in the manufacture of herbicides. SCD, however, could not make ODCB exclusively. For each pound of ODCB, SCD also made 1 1/2 to 2 pounds of PDCB and three pounds of MCB. SCD agreed to produce the

ODCB for Dupont and actively sought out new customers for the surplus PDCB that was produced in conjunction with the ODCB.

In 1972, SCD became aware that Velsicol Chemical Company ("Velsicol") needed 1,2,4 tri for use in the manufacture of herbicides. SCD entered into a contract with Velsicol for the sale of 1,2,4 tri. At the same time, SCD developed a process to make the 1,2,4 tri by chlorinating the PDCB, and it was therefore able to use the excess PDCB as a raw material in the production of 1,2,4 tri for Velsicol.

The contract between Velsicol and SCD covered the period from January 1, 1973 through December 31, 1978. The contract, containing a technical specification for 99% pure 1,2,4 tri, was a requirements contact whereby, SCD would supply 75 percent of Velsicol's requirement up to a maximum of 30 million pounds of 1,2,4 tri per year. The base price of the 1,2,4 tri was set at 11.5 cents per pound, but the agreement included a volume discount whereby the price of the materials decreased if Velsicol met certain quantity requirements under the contract. The agreement also provided a formula for SCD to adjust the price of the materials sold to Velsicol if there were changes in the price of SCD's raw materials or changes in the Consumer Price Index ("CPI").

It is impossible to produce 1,2,4 tri exclusively. In manufacturing this material for Velsicol, SCD would also be producing mixed TCBs.[24] In pricing the 1,2,4 tri to Velsicol, SCD assumed that it would be able to sell the TCB produced in conjunction with the 1,2,4 tri at a price that would at least cover its raw material and energy costs.

In 1973, Vertac became aware that SCD had a mixture of TCB available. In August of 1973 Vertac and SCD entered into a contract for the sale of polychlors. The terms of the contract covered a five-year period from January 1974 through December 1978. The material to be supplied would contain a maxi-

---

**24.** In 1972, SCD constructed a plant to produce 1,2,4 tri. Ninety-eight percent pure PDCB was reacted with chlorine and fed into a distillation column, where the unreacted PDCB was taken from the top of the column and fed back into the reactor. The bottom of the column contained a mixture consisting primarily of 1,2,4 tri and mixed TCBs. This mixture was fed into another distillation column, where the 1,2,4 tri was boiled off the top of the column and the mixed TCBs, consisting primarily of 1,2,3,4 TCB and 1,2,4,5 TCB were taken from the bottom of the column. The mixed TCBS are sometimes referred to as "trichlorobenzene still bottoms" or "polychlors."

mum of 5 percent trichlorobenzene ("Tris"), 61 to 67 percent 1,2,4,5–TCB, 30 to 33 percent 1,2,3,4–TCB, 4 percent maximum pentachlorobenzene and trace amounts of hexachlorobenzene. The contract between SCD and Vertac was a requirements contract, whereby SCD would supply 90 percent of Vertac's requirements of the polychlors up to a maximum of 10 million pounds per year.

The contract provided a volume discount. If Vertac purchased more than 6 million pounds, it received a one-half cent per pound discount; if it purchased over 8 million pounds, it received a one cent per pound discount. The base price was set at 11 cents per pound; however, the contract provided a formula whereby SCD could adjust the price of the materials sold to Vertac if there were changes in the price of SCD's raw materials or changes in the CPI. The purpose of this provision was to protect SCD's profit margin in the event of significant increases in its raw material costs.

SCD determined the base price of 11 cents per pound after taking into account the raw material values, energy and labor costs, overhead and amortization of plant and equipment, and profit margin, and thereafter discussing the price with Vertac.

Vertac could not use SCD's material without processing it further to remove the 1,2,4,5–TCB it needed from the other materials. Vertac had to build a separate facility, referred to as the "benzene plant," for separating 1,2,4,5–TCB from the polychlor material.

After the separation, Vertac was left with a residue that contained, primarily, 1,2,3,4–TCB, plus some 1,2,4,5–TCB, 1,2,4–trichlorobenzene, pentachlorobenzene, and other impurities. In Vertac's processing of the polychlors, various drips, leaks and spills occurred during the separation and handling of the 1,2,3,4–TCB residue. Spills of the 1,2,3,4–TCB residue ultimately went to the equalization basin and was discharged to the Jacksonville sewage treatment plant.

Vertac had no use for the residue. However, Vertac intended to sell the 1,2,3,4 residue. SCD advised Vertac that Olin Chemical Company ("Olin") was a potential purchaser of the residue. Vertac ultimately was able to sell virtually all of the 1,2,3,4 residue to Olin for further processing and use.

During the course of dealing between SCD and Vertac, SCD frequently invoked the price escalation clause due to frequent fluctuations in the CPI and the prices for benzene and chlorine from 1974 through 1976.

After purchasing over 6 million pounds of polychlors in the first year of the contract, Vertac notified SCD that it would need 10 million pounds of polychlors the next year, an amount in excess of SCD's ability to produce the polychlors in its normal production process. As a result, SCD and Vertac negotiated a 7.5 cent premium on the polychlors, effective January 1, 1975. The premium reflected SCD's additional production costs for chlorinating additional PDCB to produce more polychlors.

In January, 1975, Vertac requested relief from the 30–day payment term included in its contract. SCD agreed to allow Vertac extended payment terms, where Vertac would be allowed to pay on invoices in 90 days, but only on the condition that Vertac pay the cost of financing the extended term at 1 percent per month.

In March, 1975, Vertac requested a reduction in the price of polychlors to 16 cents per pound due to a decline in business. At the time, polychlors were selling for approximately 25 cents per pound. SCD refused to agree to the price reduction because SCD would not have been able to make a profit at the lower rate.

In 1976, SCD began supplying Vertac with pure 1,2,4,5–TCB in addition to the polychlors. Like Vertac, SCD sold the 1,2,3,4 residue remaining after the separation to Olin.

Vertac stopped buying the polychlors from SCD in April of 1977. Vertac's last purchase of pure 1,2,4,5–TCB from SCD was in December, 1978. The EPA ban of 2,4,5–T in 1979 basically eliminated the commercial demand for TCB.

Inspections at the Site and Offsite reveal the presence of tetrachlorobenzene, pentachlorobenzene, hexachlorobenzene and trichlorobenzenes at the Site and Offsite areas. The 1,2,4,5–TCB, 1,2,4–tri, hexachloroben-

zene, pentachlorobenzene, and the distillation or fractionation column bottoms from the production of chlorobenzenes are all classified as hazardous substances under CERCLA. 40 C.F.R. § 302.4 (Table). The polychlors that came from SCD were the source of these hazardous substances.

SCD contends that it was selling a useful product. Hercules, however, argues that the "useful product" defense does not extend to the limits asserted by SCD.

The jury found that SCD was not liable to Hercules for the arrangement for treatment or disposal of hazardous substances at the Plant Site or Offsite areas.[25] Because it did not find SCD liable as an arranger, it did not address the issue of Hercules' claim for contribution.

■ SCD argues that the jury's finding that SCD was not liable as an arranger is binding on the Court on the question of SCD's liability to Hercules. That is, SCD correctly argues that a plaintiff cannot succeed under a Section 113(f)(1) unless it first establishes that the defendant is a liable party under Section 107. Thus, the jury's finding that SCD is not liable as an arranger under Section 107(a)(3) constitutes a resolution of SCD's Section 113 liability.[26]

SCD then argues that the jury's finding binds the Court's determination of Hercules' Section 107 claim. That argument, however, conflicts with SCD's position that the contribution claim can only be brought under Section 113 and that Hercules' Section 107 claim should be dismissed.

The issue is confusing, but can be reconciled. A finding that SCD is a liable party under Section 107 is a necessary element to a contribution claim. The Court need not, at this time, decide whether that determination should be made by the Court as a matter of law or can be left to a jury.[27] It is clear that whether the Court views the jury finding as binding or merely advisory the evidence supports the conclusion that SCD is not liable.

■ "The sale of a useful, although hazardous substance, to serve a particular purpose, is not an arrangement for disposal and will not impose CERCLA liability." *Douglas County. Neb. v. Gould, Inc.*, 871 F.Supp. 1242, 1245 (D.Neb.1994). "If a party merely sells a product, without additional evidence that the transaction includes an 'arrangement' for the ultimate disposal of a hazardous substance, CERCLA liability would not be imposed." *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990).

---

25. With regard to Hercules' claim against SCD, the jury instruction read as follows:

The mere sale of a product does not amount to an arrangement for disposal or treatment. For instance, where a new and useful substance is sold to another, who then incorporates it into a product or manufacturing process, there is no arrangement for disposal or treatment. On the other hand, where there is a sale of a substance merely to get rid of it or where the sale is a sham for disposal, the seller may be found liable. Thus, if you find by the preponderance of the evidence that Standard Chlorine's sales to Vertac were of a new and useful substance that Vertac incorporated into a product or manufacturing process, then you should find that Standard Chlorine did not arrange for disposal or treatment and is, therefore, not liable. If on the other hand, you find by a preponderance of the evidence that Standard Chlorine sold its polychlors also known as tri-chlorobenzene stillbottoms to Vertac merely to get rid of them or that these sales were really a sham for disposal, then you should find that Standard Chlorine did arrange for disposal or treatment.

26. "When legal and equitable claims are tried together, the right to a jury in the legal action encompasses issues common to both." *Lincoln v. Board of Regents of Univ. System of Georgia*, 697 F.2d 928, 934 (11th Cir.1983), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983). "Thus, to the extent that the legal and equitable issues overlap, the jury's verdict on the legal claim operates as a finding of fact binding on the Court in its disposition of the accompanying equitable claim." *Dasler v. E.F. Hutton & Co., Inc.*, 694 F.Supp. 624, 627 (D.Minn.1988). *See also McIntosh v. Weinberger*, 810 F.2d 1411, 1429 (8th Cir.1987), *vacated on other grounds sub nom. Turner v. McIntosh*, 487 U.S. 1212, 108 S.Ct. 2861, 101 L.Ed.2d 898 (1988); *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1101 (8th Cir.1982).

27. Given that the parties consented to a jury trial on the contribution claim, and that liability as an arranger is a necessary element of that claim, the Court is of the opinion that the jury finding is binding. *See Control Data*, 53 F.3d at 934 (recovery of response costs requires a plaintiff to initially prove that a defendant is liable under CERCLA).

However, merely characterizing a transaction as a sale does not preclude a finding of liability. If the transaction is really a sham for disposal, CERCLA liability will attach. *Douglas County*, 871 F.Supp. at 1245. The essential inquiry, therefore, is whether SCD, by selling the polychlors to Vertac, arranged to "get rid of" hazardous substances.[28]

Hercules argues that the polychlors were not a primary business product. The still bottom mixture, according to Hercules, was nothing more than a "by-product" of SCD's production process. It further contends that the by-product material was not useful in its existing state; rather Vertac had to refine the material further to obtain the product it needed. In addition, Hercules argues that there was no effective market for the material; that SCD could not sell it to anyone other than Vertac.

■ The record establishes that the transaction involved the sale of a useful product. SCD sold Vertac a legitimate, technical grade chemical product for use as a raw material in Vertac's manufacturing operations. That the product required further processing before it could be put to its intended use is a common occurrence in the chemical industry. Indeed, a technical grade product is one that requires some further processing before it can be put to its intended use.

It was typical of the chlorinated benzene market for a company to have a few customers for a particular product. Thus, Vertac was SCD's only customer for the polychlors. Similarly, Velsicol was SCD's only customer for the 1,2,4 tri. SCD had two or three customers for the ODCB, and seven or eight customers for MCB.

SCD's sale to Vertac was conducted at a substantial profit for SCD, and the contract for sale of polychlors contained terms similar to those contained in sales contracts SCD had for other products.

"[T]he sale of a product which contains a hazardous substance cannot be equated to the disposal of the substance itself or even the making of arrangements for its subsequent disposal ..." *G.J. Leasing Co., Inc. v. Union Elec. Co.*, 54 F.3d 379, 384 (7th Cir. 1995) (citations omitted). The Court is not persuaded that SCD was attempting to get rid of a by-product for which it had no use. Thus, the transaction between Vertac and SCD is distinguishable from those in the cases relied upon by Hercules. *See e.g., Catellus Dev. Corp. v. United States*, 34 F.3d 748 (9th Cir.1994) (sale of spent lead acid batteries to a reclaimer who removed the lead plates prior to discarding the battery casing constituted arrangement for disposal); *State of California v. Summer Del Caribe*, 821 F.Supp. 574 (N.D.Cal.1993) (sale of solder dross, a by-product from the manufacture of cans, from which solder could be reclaimed after additional processing, constituted an arrangement for disposal). Fur-

---

**28.** SCD, relying on a recent Sixth Circuit case, states that the plaintiff must prove that a defendant entered the transaction with the intent of arranging for the disposal or treatment of a hazardous substance. *United States v. Cello–Foil Products, Inc.*, 100 F.3d 1227, 1231 (6th Cir. 1996) ("We conclude that the requisite inquiry is whether the party intended to enter into a transaction that included an 'arrangement for' the disposal of hazardous substances. The intent need not be proven by direct evidence, but can be inferred from the totality of the circumstances.") *See Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir.1993), *cert. denied*, 510 U.S. 1044, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994) ("arranged for" implies intentional action); *See also Ekotek Site PRP Committee v. Self*, 932 F.Supp. 1328, 1336 (D.Utah 1996) (concludes that Tenth Circuit would follow approach of Seventh and Eleventh Circuits and require intentional action before arranger liability attaches)

The Eleventh Circuit, however, rejected any attempt to substitute a *per se* rule for the phrase "arranged for." Rather, intent is a relevant, but not necessarily dispositive factor, in the determination of whether there has been an "arrangement" for disposal. *Montalvo*, 84 F.3d at 407. *See also Redwing Carriers*, 94 F.3d at 1512 (plaintiff need not demonstrate a party acted with specific intent to dispose of hazardous substances).

The Eighth Circuit has rejected the argument that Section 107(a)(3) contains a specific intent requirement. *TIC Investment*, 68 F.3d at 1087–88. Thus, it is unlikely that the Eighth Circuit would require Hercules to prove that SCD intended to dispose of the waste in order to establish arranger liability. Nevertheless, assuming an intent requirement, it is clear from the totality of the circumstances surrounding the transaction that SCD did not intend to dispose of a hazardous substance.

thermore, unlike the contaminated styrene in *Cadillac Fairview/California. Inc. v. United States,* 41 F.3d 562 (9th Cir.1994) or the used motor oil in *Ekotek PRP Committee v. Self,* 881 F.Supp. 1516 (D.Utah 1995), the polychlors sold by SCD were not waste produced as a result of prior uses of the materials for their intended purpose and they had substantial economic value in the state in which they were sold.

The evidence establishes that SCD's manufacturing process produced a number of chemically-distinct chlorinated benzenes, each of which was fit for particular industrial uses. SCD attempted to sell every chlorinated benzene it produced at profit margins sufficient to render profitable the entire manufacturing operation.

The Court will not extend CERCLA liability to SCD which sold a hazardous, but useful product to Vertac for its original use as raw material in Vertac's manufacturing operation of 2,4,5–T. *See Gould,* 871 F.Supp. at 1247 (CERCLA liability will not attach if a transaction involves the sale of a new useful product as opposed to the sale of a substance merely to get rid of it.)

Thus, the Court finds that SCD is not liable as an arranger and therefore Hercules' Section 113(f) claim for contribution against SCD must be dismissed.

### SUMMARY

In sum, the Court finds that Uniroyal is liable as an arranger under Section 107(a)(3). Thus, judgment will be entered finding Uniroyal jointly and severally liable to the United States and the ADPC & E under Section 107(a)(3) of CERCLA and liable in contribution to Hercules under Section 113(f) of CERCLA, and Hercules liable in contribution to Uniroyal under Section 113(f) of CERCLA. Hercules' claims against SCD are dismissed with prejudice.

The Court notes that allocation of response costs according to equitable principles remains. The parties are directed to file reports within twenty days setting forth proposed case management plans for the allocation phase.

IT IS SO ORDERED.