UNITED STATES of America, Plaintiff,

v.

VERTAC CHEMICAL CORP., et al., Defendants.

ARKANSAS DEPARTMENT OF POLLUTION CONTROL AND ECOLOGY, Plaintiff,

v.

VERTAC CHEMICAL CORP., et al., Defendants.

Civ. Nos. LR–C–80–109 and LR–C–80–110.

United States District Court, E.D. Arkansas, W.D.

Oct. 12, 1993.

John Sheehan, Scott Jordan, Craig Galli, U.S. Dept. of Justice, Environment & Natural Resources Div., Sean Carman, Drenaye L. Houston, Paul Schaeffer, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, Mel McFarland, U.S. E.P.A., Region VI, Dallas, TX, Sam Blesi, Dept. of Justice, Land & Natural Resources Div., Washington, DC, Samuel E. Ledbetter, Nichols, Wolff & Ledbetter, Little Rock, AR, Richard F. Ricci, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, Charles L. Moulton, Atty. General's Office, Little Rock, AR, for plaintiffs.

V. Robert Denham, Jr., Powell, Goldstein, Frazer & Murphy, Atlanta, GA, Ronald A. May, Wright, Lindsey & Jennings, Kevin A. Crass, and William H. Sutton, Friday, Eldredge & Clark, Little Rock, AR, Mark A. Turco, and Robert Brager, Beveridge & Diamond, Washington, DC, Stephen C. Engstrom, and Timothy O. Dudley, Wilson, Engstrom, Corum, Dudley & Coulter, Steven W. Quattlebaum, and G. Alan Perkins, Williams & Anderson, Little Rock, AR, for defendants.

### *MEMORANDUM OPINION AND ORDER*

GEORGE HOWARD, Jr., District Judge.

In the present case, the State of Arkansas and Vertac along with Hercules have filed motions for summary judgment asking that the United States be held liable under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.* for its role in the production of Agent Orange.[1] In response, the United States has filed a motion for partial summary judgment asking that the Court find that it is not liable.

Hercules and Vertac argue that the United States is liable as an operator under section 107(a)(2) and an arranger under section 107(a)(3) of CERCLA. They argue that the United States' liability arises from the government's authority under the Walsh–Healey

---

1. The State of Arkansas and Vertac filed a joint motion for summary judgment against the United States. The State and Vertac will be referred to collectively as Vertac.

Act, 41 U.S.C. § 35 *et seq.* and the Defense Production Act of 1950 ("DPA"), 50 U.S.C. app. § 2061 *et seq.*, during the time the Untied States purchased Agent Orange from Hercules for use in the Vietnam war.[2] The facts are basically not in dispute, and the relevant ones are set forth below.

### SUMMARY OF UNDISPUTED FACTS

Hercules purchased the assets of Reasor–Hill Corporation in December, 1961. Reasor–Hill began producing 2,4–D esters and amines in 1955, and 2,4–5–T in 1957. During the period December 1961 through the fall of 1971, Hercules owned and operated the herbicide production facility at Marshall Road in Jacksonville, Arkansas (the "Jacksonville facility.") Shortly after taking over the Jacksonville plant in 1961 and prior to entering into the rated contracts for the supply of Agent Orange, Hercules began burying wastes generated from Reasor–Hill's operations.

From 1964 through 1968, Hercules produced Agent Orange for the United States at the Jacksonville facility. Agent Orange is a mixture of the butyl esters of 2,4,5–trichlorophenoxy acetic acid ("2,4,5–T") and 2,4–dichlorophenoxyacetic acid ("2,4–D"). Hercules produced Agent Orange for the United States pursuant to rated contracts and directives issued under the DPA.

The DPA authorizes the President to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over the performance under any other contract or order, and further authorizes the President to require the acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds capable of performing the contracts. The DPA allows for a penalty to be levied against a private manufacturer in an amount of up to $10,000.00 and imprisonment of up to one year for willful failures to perform any act required by the DPA or any regulation or order under the DPA. 50 U.S.C.App. § 2073.

"Rated orders" are contracts or purchase orders that have a priority rating. There are two levels of priority ratings. The "DX" rating is the higher level of priority rating. The "DO" rating is the lower level of priority rating. Where there is a conflict between the performance of a rated order and an unrated order, the rated order takes precedent.

"Directives" are official actions taken by the Department of Commerce ("DOC") under its regulations. A directive requires a person to take an action or to refrain from taking an action. A directive takes precedence over both rated orders and unrated orders to the extent that such preference is stated in the directive.

Hercules submitted competitive bids, including sales prices, in response to the contract solicitation proposals published by the United States pertaining to Agent Orange. Hercules supplied Agent Orange to the Department of Defense ("DOD") pursuant to rated contracts and directive issues under the DPA. These rated contracts and directives were subject to rules promulgated by the Business and Defense Services Administration ("BDSA"), a primary organizational unit of DOC.

The rated contracts between DOD and Hercules contained standardized government contract terms and conditions set forth in standardized "DO Forms." DOD provided opportunities to Hercules to negotiate at least some of the terms of the contract specifications pertaining to Agent Orange. As a result of these negotiations, DOD changed or modified the terms of various contract specifications.

---

**2.** The United States used various herbicides for defoliation and crop destruction spraying in Vietnam beginning in 1962. After 1964, Agent Orange, a 50–50 mixture of the n-butyl esters of 2,4–D and 2,4,5–T was one of the most widely used herbicides. "As the war in Vietnam escalated in the mid–1960s, so too the use of herbicides expanded. In 1967, the peak year for herbicide spraying in South Vietnam, 1,687,758 acres were sprayed—85% for defoliation purposes and 15% for crop destruction." *In re Agent Orange Product Liability Litigation*, 597 F.Supp. 740, 777 (E.D.N.Y.1984)

Hercules made a profit for performing each rated contract for the supply of Agent Orange. Under the Agent Orange contracts, from June of 1964 to May of 1968, Hercules shipped over 2.7 million gallons of Agent Orange to the United States for use in the Vietnam War.

The specifications for Agent Orange were developed by the United States Army. At times, the government received input concerning some specifications from the other services and manufacturers of Agent Orange, including Hercules. Some of these specifications included information regarding physical properties, packing, and quality control instructions. Under several of the contracts for the supply of Agent Orange, Hercules was required to produce Agent Orange under other military specifications.

In March, 1967, the BDSA issued a directive under the DPA to Hercules requiring Hercules to accelerate the delivery of Agent Orange to the United States to a monthly rate of 65,000 gallons beginning April 3, 1967. This monthly rate constituted all of the Jacksonville facility's production capacity.

The directive told Hercules that the tetrachlorobenzene ("TCB") it needed to produce Agent Orange for the United State could be obtained by placing DO rated orders on Hercules' TCB suppliers, including Hooker Chemical. In connection with the March, 1967 directive, the BDSA told Hercules to inform the BDSA immediately if Hercules had any difficulty obtaining the raw material it needed to produce the Agent Orange.

Hercules was unable to meet the production demands placed upon it by the Directive and at the same time maintain its share of the commercial 2,4-D market. Hercules contracted for the import of 2,4,5-T and 2,4-D in order to comply with its contracts with the government. The government facilitated these imports of 2,4,5-T and 2,4-D by waiving, pursuant to 10 U.S.C. § 2383 (providing for duty-free treatment of emergency war materials purchased abroad), all import duties usually charged on the shipment of goods from abroad. These imports could be utilized on the Agent Orange contracts (but only on those contracts), thereby freeing up some 2,4-D production.

The United States did not directly supply Hercules with TCB or any other raw material. The United States did not own or physically possess any TCB or any other raw material which Hercules obtained, by the placement of rated orders, from Hooker Chemical Corporation or any other supplier.

The United States, beginning in 1967, issued directives to Hooker requiring Hooker to supply the necessary raw materials for the production of Agent Orange to the suppliers, including Hercules.

The United States held no financial ownership interest in the land, buildings, tools, machinery or equipment used by Hercules during the period of time in which Hercules produced Agent Orange. Hercules considered parts of its process, including the toluene extraction process, for the production of Agent Orange as proprietary information.

The active ingredients for 2,4,5-T and 2,4-D sold to the Department of Defense ("DOD") were the same as those contained in some commercial 2,4,5-T and 2,4-D products. However, the 2,4,5-T and 2,4-D products sold commercially by Hercules were sold in a diluted form. The product sold to the government was sold in an undiluted form.

After termination of the contracts with DOD for the supply of Agent Orange, Hercules manufactured and sold various formulations of esters and salts of 2,4,5-T and 2,4-D to commercial customers.

The United States admits that the production of Agent Orange generates wastes and that it knew or should have known that. The parties also agree that many of the wastes generated by Hercules from the production of 2,4,5-T sold to DOD and to commercial customers contained "hazardous substances" within the meaning of CERCLA. Hercules buried wastes generated from the production of 2,4,5-T sold to DOD and to commercial customers at the Jacksonville facility. These wastes are still located at the facility.

There is no dispute that the contracts did not require Hercules to bury the wastes or to handle them in any particular manner. Hercules made the decision to bury the wastes at the Jacksonville facility, without consulting

with DOD or DOC personnel. Furthermore, the DOD or DOC took no part in designing, performing, or supervising activities relating to the handling, treatment or disposal of wastes during the time Hercules owned and operated the Jacksonville facility.

In addition, during the time Hercules owned and operated the Jacksonville facility, the United States did not hire, fire, discipline, manage or train any Hercules personnel who worked in the Agent Orange production process.

## "OPERATOR" AND "ARRANGER" LIABILITY UNDER CERCLA

Vertac and Hercules assert that the United States is liable as an operator under section 107(a)(2) of CERCLA. That section imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated the facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Similarly, Vertac and Hercules assert that the United States is liable as an arranger under section 107(a)(3) of CERCLA, which imposes liability on any person who arrange for disposal of hazardous substances owned or possessed by the person at any facility from which releases have occurred.

Their argument relies on the "authority to control" they claim the United States had with regard to the disposal of the wastes under the DPA and Walsh–Healey Act.

■ Under Section 107(a)(2), a non-owner of the property is liable as an operator if the person either (1) actually participated in the operations of the facility; or (2) actually exercised control over, or was otherwise intimately involved in the operations of the corporation immediately responsible for the operation of the facility. *Levin Metals v. Parr–Richmond Terminal,* 781 F.Supp. 1454, 1456 (N.D.Cal.1991).

■ Two alternative bases exist for arranger liability in this context. In *United States v. Northeastern Pharmaceutical & Chemical Co. ("NEPACCO"),* 810 F.2d 726, 743 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987), the court imposed arranger liability on persons who actually controlled or had authority over the disposal of hazardous substances even though they did not own or physically possess them. Thus, arranger liability could be imposed where the defendant had actual authority to control the disposal of hazardous substances.

In the absence of actual involvement in the disposal of the hazardous substances, arranger liability has been found where the defendant retained ownership or control of the hazardous substances throughout the production process that generated the hazardous waste. In *United States v. Aceto Agricultural Chemicals Corp.,* 872 F.2d 1373 (8th Cir. 1989), the court denied a motion to dismiss where the defendants—pesticide manufacturers—had owned and possessed the hazardous substances prior to arranging for disposal. The manufacturers contracted with Aidex Corporation—a formulator of chemicals to blend and package their pesticides. It was during Aidex's handling of the raw materials owned by the manufacturers that there were spills of the materials at the Aidex.

The Eighth Circuit held that arranger liability could be inferred where (1) the person owned the hazardous substances or supplied them to another person who processed them and, thereafter, disposed of at least some of the hazardous substances; and (2) the person owned or controlled the hazardous substances during the work in process; and (3) the generation and disposal of hazardous substances were inherent in the production process.[3] See *Jones–Hamilton v. Beazer*

---

**3.** Dow, in its response to the cross motions for partial summary judgment, argues that the United States has eliminated a third element in its analysis of *Aceto.* That is, the United States construes *Aceto* as requiring ownership of raw materials, the work in process, and the final products, without any authority, involvement, or direction over the process resulting in the disposal of hazardous substances, to be sufficient to confer arranger liability. Dow contends that arranger liability under *Aceto* requires a finding that defendants directed and controlled the process under which the hazardous substances were generated.

The Court need not decide, at this time, whether the narrower standard urged by Dow should be applied in this instance. The uncontested facts reveal that the United States neither owned

*Materials & Services,* 959 F.2d 126, 131 (9th Cir.1992) (arranger liability could be found where defendant retained ownership of the materials it provided, the materials provided included hazardous substances, and the contract contemplated a small amount of spillage of the hazardous materials).

■ Thus, to impose arranger liability on the United States arising from its purchase of Agent Orange, Vertac and Hercules must prove either (1) under *NEPACCO,* that the United States had the actual authority over the disposal of hazardous substances at the Hercules plant, or (2) under *Aceto* that the United States supplied the raw materials, and owned or controlled the work in process, and that the generation of hazardous substances was inherent in the production process.

■ The undisputed facts in the case reveal that the United States cannot be held liable as either an operator or an arranger. There is no evidence that the United States actually participated in the actual management or daily operations of the facility. The United States neither supplied the raw materials used to make Agent Orange nor did it own or possess the raw materials. It did not dictate the manner in which the wastes were to be disposed or nor did it in any way control the disposal of those wastes.

There is no dispute that Hercules' contracts with the United States subjected it to the terms of the Walsh–Healey Act. The Act provides for government regulation of worker safety and health practices. It provides that no part of a government contract subject to the Walsh–Healey Act will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under the contract be manufactured or fabricated in any plants or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of the employees performing the contract.

Walsh–Healey inspectors visited the plant for the limited purpose of investigating occupational safety and health hazards that could potentially harm Hercules employees. The inspectors did not assume any management or control over Hercules waste disposal activities.

The Walsh–Healey Act did not give the Department of Labor ("DOL") inspectors any authority over Hercules' disposal of hazardous waste. The DOL had the authority only to issue citations for worker health and safety violations. Indeed, the DOL issued two Notices of Violation to Hercules. In October of 1968, a DOL safety engineer found a number of safety violations upon the inspection of the plant. The DOL issued a "Notice of Violation" outlining the deficiencies. One month later, an industrial hygienist with the DOL conducted a follow-up inspection. Following his inspection, the DOL served Hercules with another "Notice of Violation." Hercules responded to both notices and took appropriate corrective measures to remedy the problems.

Of import is that DOL had no authority to control the manner in which the contractor remedied the problem. Thus, even assuming that the inspector found problems with Hercules' disposal of wastes, he or she could only issue a citation. The manner in which Hercules dealt with the problem, or how it intended to treat or dispose of its wastes, was left to its discretion.

The Court cannot find, based on the undisputed facts, that the authority of the United States to regulate the working conditions of the employees at the plant under the Walsh–Healey Act gave the United States the authority to control the waste disposal activities required for liability under CERCLA.

Hercules and Vertac argue that the DPA gave the United States pervasive control over virtually all aspects of Hercules' operations and business at the Jacksonville plant. Such an attempt to inject the element of "substantial control" into attempt performance of contracts under the DPA must be rejected.

nor controlled the work in process, and therefore, it is not liable even under the broader

standard sought by the United States.

Section 101 of the DPA gives the President authority to require companies to accept and perform any contracts and orders that the President deems necessary or appropriate to promote the national defense, and to require that companies give priority to the performance of such contracts over the performance of other contracts or orders. 50 U.S.C. app. § 2071. The DPA does not give the United States the authority to take over the plant, or to control the contractor's operations and activities. Rather, the relationship between the United States and the contractor under the DPA is one of buyer and seller, except that the buyer (i.e., the United States) has the power to require the seller to perform the contract and to give it priority over other contracts.

Hercules also argues that it was compelled to perform the Agent Orange contracts under the DPA. A similar argument was rejected in *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 950 (E.D.N.Y.1992). There, Agent Orange manufacturers (including Hercules) sought removal to federal court of a tort action brought against them by civilians in Vietnam during the war. While the court recognized that the manufacturers of Agent Orange were compelled to deliver the product to the United States, the court stated, in relevant part:

> They [the manufacturers] are being sued for formulating and producing a product all of whose components were developed without direct government control and all of whose methods of manufacture were determined by the defendants.... The government sought only to buy ready-to-order herbicides, not to cause, control, or prevent the production of the unwanted byproduct, dioxin, which is the alleged cause of plaintiffs' injuries.

Furthermore, the Court cannot find under the circumstances that the degree of compulsion asserted by Hercules existed. There is no dispute that Hercules actively sought Agent Orange contracts by participating in competitive bidding and that it made a profit from each contract. There is also no dispute that Hercules sold herbicides similar to Agent Orange both prior to and after the contracts with the government. *See Ryan v. Dow Chemical*, 781 F.Supp. at 950 ("The government bought the chemical components for Agent Orange and other defoliants as existing products privately developed and used them in mixtures which were derived from defendants' standard recipes. Thus, the 'compulsion' under which the defendants operated predominantly concerned marketing rather than design and manufacture.")

Hercules and Vertac make much of the "authority" to control. However, their attempt to impose liability on the United States based merely on an "opportunity or ability to control" Hercules' waste disposal practices must be rejected. In *General Electric Co. v. Aamco Transmissions, Inc.*, 962 F.2d 281, 286 (2nd Cir.1992), the court refused to accept a similar argument. The court concluded "that it is the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger under CERCLA's liability provision." The court further noted that courts holding defendants liable as arrangers have found that the defendant had some actual involvement in the decision to dispose of the waste. "The most commonly adopted yardstick for determining whether a party is an owner-operator under CERCLA is the degree of control that party is able to exert over the activity causing the pollution." *CPC International, Inc. v. Aerojet–General Corp.*, 731 F.Supp. 783, 788 (W.D.Mich.1989) (finding that "mere regulatory activities will not subject a state agency to liability as an owner-operator.")

The Court finds that the United States did not have authority over or involvement with Hercules' operations and decisions concerning the plant and the disposal of wastes. Such authority or involvement cannot be conferred from either the Walsh–Healey Act or the DPA. As such, the Court finds that the United States is not liable as an arranger or operator under CERCLA for its role in the production of Agent Orange.[4]

---

4. The Court finds that questions of fact exist concerning the United States liability as an "owner" for the Arkansas Ordnance plant during the World War II period.

· The Court has reviewed the remaining arguments asserted by Hercules and Vertac and finds that they are without merit. In particular, the Court finds that Hercules is not entitled to immunity under section 707 of the DPA or to indemnity.

Accordingly, the motions for partial summary judgment of Vertac and ADPC & E (document number 1170) and Hercules (document number 1339) are denied; the motion for summary judgment against Vertac, et al. (document number 1403) is granted.

IT IS SO ORDERED.