**UNITED STATES of America, Plaintiff,**

v.

**VERTAC CHEMICAL CORP., et al., Defendants.**

**No. LR–C–80–109.**

United States District Court, E.D. Arkansas, Western Division.

Dec. 28, 1999.

V. Robert Denham, Jr., Powell, Goldstein, Frazer & Murphy, Atlanta, GA, Charles L. Schlumberger, Wright, Lindsey & Jennings, Little Rock, AR, for Hercules, Inc.

Steven W. Quattlebaum, Williams & Anderson, Little Rock, AR, for Uniroyal Chemical.

### MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

The final stage of this almost twenty year old case involves the allocation of costs incurred by the Environmental Protection Agency (EPA) and by Hercules, Inc. (Hercules) for the remediation of hazardous contamination and wastes on approximately 93 acres of land in Jacksonville Arkansas, known as the Vertac Site and certain nearby off-site areas.[1] On August 8, 1999, the Court entered judgment in favor of the United States and against defendants Hercules and Uniroyal Chemical, Ltd. (Uniroyal) in the amount of $89,084,710.00 plus any additional response costs incurred or to be incurred after May 31, 1998 and post-judgment interest.[2]

The Vertac Plant Site is located in Jacksonville, Arkansas. Herbicide products, including 2,4,-D (dichlorophenoxyacetic acid), 2,4,5–T (trichlorophenoxyacetic acid) and 2,4,5–TP (trichlorophenoxyproprionic acid) were produced at the plant from around 1957 until 1986. Hazardous substances, including dioxin, were generated during the operations at the Site, and were disposed at the Site and Off Site areas.

---

1. The history of the Vertac Site and Off–Site areas has been discussed in a number of decisions. *See United States v. Vertac Chemical Corp.* 33 F.Supp.2d 769 (E.D.Ark.1998); *United States v. Vertac Chemical Corp.*, 966 F.Supp. 1491, 1494 n. 1 (E.D.Ark.1997).

2. Judgment was also entered against Hercules in the amount of $11,182,781 for costs associated with the two landfills (Jacksonville Landfill and Rogers Road Landfill) for which Uniroyal was not held liable.

The disposal of the hazardous substances caused contamination of areas and equipment both on and off the Site, and the accumulation of over 28,000 drums of hazardous wastes.

Two parties are involved in the allocation stage. Hercules was found liable as an owner/operator and arranger.[3] Uniroyal was found liable as an arranger based on tolling agreements Vertac and Uniroyal entered into whereby Uniroyal sent 1,2,4,5–tetrachlorobenzene ("TCB") to Vertac for Vertac to convert into 2,4,5–T for Uniroyal. *See United States v. Vertac Chemical Corp.*, 966 F.Supp. 1491 (E.D.Ark. 1997).

As can be expected, Hercules and Uniroyal each advance different arguments.[4] On the one hand, Uniroyal relies primarily on the relative involvement of the liable parties. It contends that its role as an arranger was minimal. It asserts that the Court should use a volumetric calculation, which can be calculated based on the evidence presented at the hearing. Based on Uniroyal's calculations, a volumetric calculation would result in an initial allocation of 1.58% to Uniroyal and 98.42% to Hercules. In addition to its volumetric calculation, Uniroyal argues that it is then entitled to a "downward departure." Hercules, on the other hand, attempts to divvy up the site, so that it ends up with an allocation in which Uniroyal would be about 70 percent liable. In particular, Hercules advances a division in which it has no connection with the drummed waste, the EPA's single largest expenditure.

Hercules' attempt to limit its responsibility for response costs to about 30 percent is, on its face, absurd. Hercules operated or owned the plant from 1961 to 1976.

It had the greatest presence, by far, of any of the responsible parties. The problem is that Uniroyal and Hercules are left "holding the bag" for Vertac, who at least arguably caused the greatest amount of harm.

▪ Resolution of contribution claims under CERCLA is governed by 42 U.S.C. § 9613(f). It provides: "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). The statute does not limit the courts to any particular factors, but grants the court "broad discretion to balance the equities in the interest of justice." *Bedford Affiliates v. Sills*, 156 F.3d 416, 429 (2d Cir.1998). In an attempt to find an equitable resolution to what is at times a complex problem, the courts have employed a number of approaches. *See* David G. Mandelbaum, *Toward A Superfund Cost Allocation Principle*, 3 Envtl. Law. 117, 124 (1996) (noting the difficulty in allocating costs). Most have looked to the what are referred to as the "Gore factors," proposed by then Senator Albert Gore as a method to apportion joint and several liability. These factors are:

(1) the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished;

(2) the amount of hazardous waste involved;

(3) the degree of toxicity of the hazardous waste;

(4) the degree of involvement of the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

---

**3.** On October 12, 1993, the Court granted the United States' motion for partial summary judgment against Hercules on the issue of liability under CERCLA, noting Hercules' long history of involvement with the Vertac Site established its liability as a responsible person under Sections 107(a)(2) and 107(a)(3) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607.

**4.** *See* Williams D Evans, Jr., *Turn Out the Lights, The Party's Over: The Emerging Consensus on CERCLA Salvage Litigation Issues*, 29 Envtl. L. Rep. 10203 (1999) (noting that the focus of contentious CERCLA litigation has shifted from the liability of PRPs to the secondary suits for contribution among liable PRPs).

(5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

*Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 935 (8th Cir.1995). The factors are neither an exhaustive nor exclusive list. *United States v. Colorado & Eastern R. R., Co.*, 50 F.3d 1530, 1536 n. 5 (10th Cir.1995). The primary emphasis is placed on the harm each party causes the environment and care on the part of the parties. *Control Data* at 935–936.

■ Divisibility of harm is not a defense to a contribution action under § 113(f), although the Court may consider separate harms caused by different parties in allocating costs. *See Redwing Carriers, Inc. v. Saraland Apts.*, 94 F.3d 1489, 1513–14 (11th Cir.1996). *But see Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 77 (1st Cir. 1999) (party may avoid liability for response costs in contribution action "if it demonstrates that its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts.")

Hercules seeks to divide the Site into various areas, or "harms." The Court has previously rejected Hercules' attempt to divide the Site into "mini-sites."[5] The Court, however, is not persuaded that the "mini-sites" represent "distinct" harms on which the Court can allocate costs. The history of this site reveals a commingling of the wastes. Furthermore, Hercules'

proposed division is, at best, arbitrary, and couched in terms to reduce Hercules' liability. As the First Circuit recently noted in rejecting a quantitative minimum at which a party could be held responsible, the task of tracing chemical waste to particular sources in particular amounts "is often technologically infeasible due to the fluctuating quantity and varied nature of the pollution at a site over the course of many years." *Acushnet Co. v. Mohasco Corp.*, 191 F.3d at 77.

The problem noted in *Acushnet* is illustrated by Hercules' argument regarding the costs associated with the incineration of the drummed wastes. When the State ordered Vertac to shut down in the summer of 1979, there were approximately 2700 drums of 2,4,5–T still bottoms stored on-site. Workers spent much of the summer placing those 55–gallon drums into larger drums, shoveling up contaminated soil, and placing that soil into the larger overpack drums. When Vertac resumed production in the fall of 1979, it produced only 2,4–D and eventually accumulated about 26,000 drums of 2,4–D waste. This waste was accumulated between 1979 and 1986, when Hercules had no involvement or presence at the Site.

Hercules argues that no dioxin is produced in the 2,4–D manufacturing process. Thus, according to Hercules, none of the 2,4–D waste drums should have contained dioxin. Furthermore, Hercules presented expert testimony to demonstrate that there should not have been cross contamination of the 2,4–D waste with the 2,4,5–T wastes. According to Hercules, none of the 2,4–D wastes should have had any detectable concentration of dioxin from the

---

**5.** The Court in its Order finding Hercules liable under section 107 rejected its attempt to establish divisibility by dividing the Vertac site into mini-facilities. The Court stated: "Dividing the site does not demonstrate divisibility; rather Hercules' mini-facilities approach goes to its argument at the allocation phase." (October 12, 1993 Order, p. 4). *See United States v. Township of Brighton*, 153

F.3d 307, 313 (6th Cir.1998), where the court rejected a PRP's attempt to divide an area into multiple parts to avoid the broad definition of "facility" under 42 U.S.C. § 9601(9)(B). The court noted that "effects of the coarseness of" the definition of facility are mitigated by the availability of divisibility and contribution.

fall of 1979 onward, when Vertac ceased manufacturing 2,4,5–T.

Hercules states that it had no involvement in management of the drummed wastes and should not be responsible for the costs of incineration of the drummed waste. Of course, Uniroyal, as an arranger, also did not have any involvement.

The Court has previously found that there was cross-contamination and commingling of the wastes at the entire Site. During the years Hercules operated the plant, Hercules generated hazardous substances which were disposed of at the Site through "leaks, spills, drum burial, and other releases into the environment... The Hercules operation resulted in contamination of soil, groundwater, equipment, tanks, sewer lines, the sewage treatment plants, and sediments and flood plains in Rocky Branch Creek and Bayou Meto." *United States v. Vertac Chemical Corp.*, 966 F.Supp. 1491, 1494–95 (E.D.Ark.1997).

Furthermore, as noted in previous decisions, dioxin was found in the 2,4–D wastes. *See United States v. Vertac Chemical Corp.*, 33 F.Supp.2d at 780. The Court will not second guess the studies and find that they are incorrect or unreliable, as requested by Hercules. Additionally, Hercules admitted that some degree of dioxin contamination found in the 2,4–D drums could have come from contaminated soil being placed in the drums. That soil was contaminated by years of production.

Thus, the Court is not persuaded that Hercules has established "separate harms" on which to allocate responsibility.

The Court has considered carefully the arguments of the parties, the voluminous record and reviewed a large number of decisions and articles in an attempt to reach an equitable resolution to the problem. Allocation of costs between the two remaining parties is difficult, given the particular circumstances of this case where one of the major polluters is insolvent, a

number of parties have settled, and the remaining parties' involvement at the site are quite different. *See Browning–Ferris Industries of Ill. v. Ter Maat*, 13 F.Supp.2d 756, 777–78 (N.D.Ill.1998), *rev'd on other grounds*, 195 F.3d 953 (7th Cir. 1999) (discussing difficulty in allocating response costs and stating that allocation in the case would be a "best guess" proposition).

At first glance, Uniroyal's argument that it is responsible for about 1 percent of the costs seems inequitable. It would amount to less than $1 million dollars, when the overall cleanup effort for which Uniroyal was held jointly and severally liable was almost $90 million. Nevertheless, it is clear that Hercules' "responsibility as an owner and operator, who was deeply involved in the daily operations of the waste-producing enterprise," should far exceed that of Uniroyal, whose involvement with the Vertac Site was indirect and for a limited time. *See Bedford Affiliates*, 156 F.3d at 430. The question, of course, is how much responsibility to assign in light of the circumstances.

As discussed above, Uniroyal argues for strictly a volumetric approach. In this instance, the Court is persuaded that volumetrics is the most significant factor and should be the starting point at which to assess each party's contribution. However, the Court is not persuaded that volume alone should be the measure of allocation.

Uniroyal presented evidence of the volumes of product produced at the plant during the various ownership periods. The rates of production were based on production records and other documents. Hercules does not dispute the production rates presented by Uniroyal's expert, Steven Michael Quigley. Reasor–Hill was estimated to have produced 6,240,000 pounds of 2,4–D and 2,4,5–T.[6] Hercules produced about 33,231,400 pounds of 2,4,-D, 2,4,5,-T and 2,4,5–TP during the time it owned and operated the site. During the time Tran-

---

**6.** Quigley noted that the production numbers for Reasor–Hill are based on reasonable esti-

mates because of the lack of production records. (Tr. 795–796)

svaal leased the Site from Hercules (1971–1976), it produced approximately 43,004,-255 pounds of 2,4,-D, 2,4,5–T and 2,4,5–TP. Vertac produced 71,183,140 pounds of 2,4,-D, 2,4,5–T, and 2,4,5–TP between 1976 and 1987. Of that, Vertac produced 1,344,000 pounds of 2,4,5–T for sale to Uniroyal. In all, about 153,658,795 pounds of 2,4–D, 2,4,5–T and 2,4,5–TP were produced at the plant site during its years of operation.

■ If Uniroyal's share of the total production was considered, it would amount to 0.87 percent. The more equitable approach, however, is to calculate the amount of Uniroyal's share in comparison to that of Hercules. Production during the years Hercules owned or operated the plant was 76,235,655 pounds of 2,4–D, 2,4,5–T and 2,4,5–TP.[7] Uniroyal's production is 1.76 percent of that of Hercules.

Hercules argues that the volumes of the parties cannot be compared because Hercules produced the majority of its 2,4–D and 2,4,5,-T to fulfill Agent Orange contracts during the 1960's. According to Hercules, only 2 million pounds of 2,4,-D and 1 million pounds of 2,4,5–T or 2,4,5–TP were produced for "commercial customers." Uniroyal, by comparison, produced 1.34 million pounds of 2,4,5–T for commercial customers through its tolling arrangement with Vertac.

The Court has already discussed the Agent Orange contracts in *United States v. Vertac Chemical Corp.*, 841 F.Supp. 884 (E.D.Ark.1993), *aff'd*, 46 F.3d 803 (8th Cir. 1995), *cert. denied*, 515 U.S. 1158, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995). In that decision, the Court noted that Hercules bid on the contracts, and profited from them. 841 F.Supp. at 890. The Court cannot find that Hercules' production of Agent Orange which was used as part of the country's military effort in Vietnam should be given any consideration.

Hercules also argues that Uniroyal's predecessor developed a process that led to the creation of the 2,4,5–T still bottoms which should be considered in determining each party's contribution. This argument requires the Court to find causation based on a tenuous thread. The Court refuses to impose greater costs on Uniroyal based on a process developed in the 1960's which Hercules purchased and used.

■ As stated above, production volume is the most significant factor in allocating the costs in this case. The volumetric approach takes into account the relative involvement of the parties at the Site and their contribution to the harm created. Uniroyal argues that it is entitled to a "downward departure" because of its limited involvement. Uniroyal was neither an operator nor owner. Hercules was an operator of the Site for nine years, an owner of the plant for fourteen years and a lessor for five years, during which it had the authority to control the lessee's operations. The Court is not persuaded, however, that Uniroyal's "lack of involvement" warrants a downward departure. The Court has already considered Uniroyal's relatively minor degree of involvement in looking at volumetrics. The Court is also not persuaded that Uniroyal is completely uninvolved, as it would have the Court find. It arranged for production of hazardous materials through a tolling arrangement, and it was aware of the production of hazardous wastes that would be produced as a result of the product. It benefitted from the production of hazardous materials at the Site.

It is, therefore, not inequitable to place a larger percentage of costs on Uniroyal than just what the difference in volume would support. In *Browning-Ferris Industries of Illinois, Inc. v. Ter Maat*, 195 F.3d 953 (7th Cir.1999), the court found

---

7. Uniroyal has included Reasor–Hill's production in the amount attributable to Hercules because Reasor–Hill was purchased by Hercules. The Court will not include Reasor–Hill's production with that of Hercules.

There is no evidence that Hercules is liable as a successor corporation. The Court will consider Reasor–Hill's share as part of the orphan share to be divided as set forth *infra*.

that allocating a larger share of responsibility to one responsible party who had operated the landfill for fewer years and dumped less waste in it than other parties was equitable. The court found that the polluter's conduct was a sufficient though not necessary condition of the clean up. Similarly, here, the production of 2,4,5–T for Uniroyal which resulted in the production of hazardous wastes was a sufficient condition for the clean up. The Court previously found that some of the drums and tanks contained dioxin contaminated waste from the production of Uniroyal's 2,4,5–T. That is, but for the production of 2,4,5–T for Uniroyal, there would not be a certain amount of wastes left and ultimately stored in the drums that had to be incinerated.

■ The Court finds that an "upward departure" is warranted in this instance. The percentage will be small given Uniroyal's limited involvement with the Site, but takes into account Uniroyal's role in the generation of hazardous material.

The Court has also given consideration to the parties' cooperation with government officials. Hercules responded to EPA's Orders under Section 106 of CERCLA and undertook extensive remediation.[8] Hercules' efforts arguably had some effect on reducing the costs of remediation, and therefore Uniroyal's liability. Uniroyal did not respond, taking the position that it had cause to disregard Section 106 Orders because the Court did not find it liable until 1997. The Court notes, however, that the case on which it relied for finding Uniroyal liable as an arranger, *United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373 (8th Cir.1989), had been decided several years before the first 106 Order. Thus, the Court finds that the sixth Gore factor also justifies finding Uniroyal to be responsible for more than the 1.76 percent and that Uniroyal and Hercules should share, pro

rata, the orphan shares of Reasor–Hill and Vertac.

Hercules points to a number of other factors that the Court should consider in allocating the costs to reduce its costs. For example, Hercules introduced evidence that Vertac was not as concerned about safety and cleanliness as Hercules and that the plant went downhill under Vertac.

There is no doubt that Hercules' safety and environmental programs are to be commended. However, the degree of care used in Hercules in handling the waste does not have any weight in allocating the costs between Uniroyal and Hercules. Hercules owned and operated the plant, and therefore was in a position to oversee the care used at plant site. As discussed above, Hercules' safety and maintenance programs are laudatory; however, that being so does not mean that Uniroyal should assume more of the costs. Uniroyal was in no position to manage the disposal of any hazardous materials.

Hercules also introduced evidence regarding the knowledge the scientific community had of the problems with dioxin at the time Hercules manufactured the herbicides and pesticides. Although Hercules learned of the presence of dioxin by the mid–1960s, the technology did not exist at that time to adequately analyze the presence of dioxin in the soil or water during the years that Hercules operated the plant. Furthermore, the possibility of a link of dioxin to cancer did not surface until the mid to late 1970s.

The evidence regarding the state of knowledge of dioxin is interesting but irrelevant to this proceeding. It does not negate that the Court has found hazardous materials at the Site.

Hercules also points to its production of Agent Orange for the government as a mitigating factor. Of course, the Court

---

**8.** Hercules has committed to operate the wastewater treatment system for about twenty more years.

has already addressed this issue. *See supra.*

In sum, after consideration of all the evidence, the Court finds that Uniroyal should be responsible for 2.6 percent of the costs for which it is jointly and severally liable. This includes the orphan shares. Thus, the parties are entitled to contribution from one another consistent with the allocation findings expressed herein.

The parties are directed to consult with each other, and the EPA regarding the offsets from other PRPs, the interest calculations, and the allocations as set forth in this Order. If the parties can agree on the amount, they should submit a proposed precedent for judgment within twenty days of the date of this Order. If not, each party should submit a proposed precedent setting forth its position.